[No. A043127. First Dist., Div. Three. Dec. 31, 1991.]

THE PEOPLE, Plaintiff and Respondent, v.
BRADLEY NELSON PAGE, Defendant and Appellant.

**[Opinion certified for partial publication.*]**

*Certified for publication except as to parts II B, C and D of the Discussion. (Cal. Rules of Court, rules 976(b) and 976.1.)

**COUNSEL**

Kyle Gee, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, Herbert F. Wilkinson and Joanne S. Abelson, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**WHITE, P. J.**—On November 4, 1984, University of California at Berkeley (U.C. Berkeley) undergraduates Bradley Nelson Page, his girlfriend, Roberta "Bibi" Lee, and their friend, Robin Shaw, went jogging together in the Oakland hills. During the run, Bibi Lee became separated from the other two joggers and disappeared. Her disappearance and the ensuing search became a cause celebre in the local media.

A month after she disappeared, Ms. Lee's body was found near where she had been running with her friends. The next day, Page was questioned by the

police for several hours. Page ultimately confessed he had struck Bibi and left her unconscious in the woods. He also admitted he had gone back to the scene of the crime that night, where he had sex with Bibi's dead body, and buried her using a hubcap from his car. However, almost immediately, Page recanted his confession, claiming it was the product of police coercion and his own guilt and confusion.

In his first trial, the jury acquitted Page of first and second degree murder, but could not reach a verdict on the charge of voluntary manslaughter. In the second trial, the jury convicted Page of voluntary manslaughter. Page is presently free on bail pending appeal.

On appeal, Page contends the manslaughter conviction must be reversed because the trial court improperly restricted a defense expert's testimony on the psychological factors which allegedly caused Page to give a false confession. In addition, Page contends the conviction must fall because the reporter failed to transcribe three days of the jury voir dire. Finally, Page argues the trial court improperly commented on his testimony, implying that it believed Page was guilty, and abused its discretion when it admitted grisly photographs of Ms. Lee's partially decomposed head.

We affirm.

# I

## FACTS

Bradley Page met Bibi Lee in the fall of 1983 when both lived at Lothlorien, a U.C. Berkeley cooperative residence. They began dating in early 1984 and by that summer had developed a "strong commitment" to each other. At the beginning of the 1984 school year, however, Bibi moved out of the co-op to an apartment she shared with other students.

There was some evidence that the relationship between Page and Bibi was tense, particularly just before her disappearance. On the night before Bibi disappeared, a Saturday, Page went to a party with Jan Carmanotti, a woman he knew from high school. Page had strong feelings toward Jan, and Bibi was apparently jealous when she learned Page had gone on the date " 'dressed to kill.' "

*Bibi Lee Disappears.*

The following morning, Sunday, November 4, Page had planned to go on a run with Bibi, Robin Shaw, and his roommate, Jeff Dlott. Jeff opted out of

the run at the last minute and Page met 19-year-old Ms. Shaw, who also lived at Lothlorien, in the co-op living room at about 8:30 a.m. He told Ms. Shaw that Bibi was late, and they both went out to the courtyard to wait for her.

Theresa Nicol, another Lothlorien resident, saw Bibi in the co-op kitchen sometime after 8:30. She seemed angry, and asked Nicol if she had seen Page. Nicol said she thought Page was upstairs. Bibi went to look for him, but returned a few minutes later, still in a bad mood. Bibi wrote a note to Robin Shaw, which said "Robin, I guess I missed you," and put it in Robin's mailbox.

A short while later, Bibi went out into the courtyard where she saw Page and Ms. Shaw. She seemed angry and snapped "you could have waited." Both Page and Ms. Shaw were puzzled by this comment, because obviously they *had* waited.

The trio then piled into Page's car, a 1969 Dodge station wagon, and drove to the Skyline Gate of Redwood Regional Park in the Oakland hills. During the drive Bibi still appeared upset and the atmosphere in the car was tense.

When they arrived at the Skyline Gate, they decided to run south along the West Ridge Trail, which runs parallel to Skyline Boulevard. This trail begins as a fire road, narrows at an archery range, then empties two miles south at Roberts Park, a small enclave consisting of a pool, playground, and picnic area.

The three joggers began running and stayed close together; the atmosphere was still tense. When they reached Roberts Park, Ms. Shaw, who was behind the others, saw Page run off in one direction while Bibi veered off toward Skyline. Ms. Shaw assumed Bibi wanted privacy, so she followed Page. Page and Ms. Shaw continued running for about 200 yards to a vista point overlooking the Bay Area. They admired the view for a few minutes and then went to another vista overlooking Mount Diablo. After a few minutes, they returned to the pool area to look for Bibi.

When they discovered Bibi was not at the pool area, Page called her name several times. When she did not respond, Page and Ms. Shaw walked the two miles back to Skyline Gate to see if Bibi had gone back to the car. Bibi was not at Skyline Gate. Consequently, Page and Ms. Shaw decided that Page would drive back along Skyline Boulevard to look for Bibi while Ms. Shaw remained at Skyline Gate in case Bibi returned.

Ms. Shaw estimated Page returned approximately 15 to 20 minutes after he left to look for Bibi. When he came back, she noticed he seemed upset,

and described him at various times as being "angry," "worried" and "somewhat scared and confused." Page told Ms. Shaw he had not seen Bibi.

They discussed various ways that Bibi might be able to get home on her own and, after about 10 minutes, decided to leave. Ms. Shaw was not comfortable with this decision, but acquiesced when appellant said he knew Bibi better than she did and that he would take responsibility.

After Page returned to Lothlorien, he ate breakfast. Around 1 p.m. he called Bibi's apartment and spoke with her roommate, Dana Friedman. He asked her if Bibi was there. When Ms. Friedman said "no," he asked her to leave a message telling Bibi he had gone to San Francisco.

Shortly after he made this call, Page and several other Lothlorien residents left on a prearranged trip to the Exploratorium in San Francisco. Bibi had planned to go on this trip. Jeff Dlott remembered that Page told him that Bibi had become "separated" during the trip to Skyline and might not make it.

Page returned to Lothlorien at 6 p.m., where he had dinner. He had forgotten about Bibi during the trip to the Exploratorium and was "feeling great." Robin Shaw saw him in the dining room and thought of asking about Bibi; however, he seemed in good humor so she assumed everything was fine.

Page called Bibi's apartment after dinner and again spoke with her roommate, Dana Friedman. He asked Ms. Friedman if Bibi was there and asked her to check the message board to see if she had picked up his earlier message.

The evidence is in conflict concerning Page's whereabouts between the time he made this call and 11 p.m. on November 4. This is the period during which Page allegedly returned to the scene of the crime, had sex with Bibi's dead body, and buried her. When first asked by the police, Page told them he could not remember what he had done that evening, although he said he might have written a paper. At trial, he relied on the testimony of three witnesses to establish that he was at Lothlorien during at least a portion of this period.

Amy Hacker, a former Lothlorien resident and appellant's wife at the time of trial, testified that she saw appellant in the Lothlorien courtyard at approximately 8:45 or 9 p.m. while she was studying in her room. However, she never mentioned this to anyone, including the police or appellant's lawyer, until one month before the first trial, by which time she was pregnant with appellant's baby.

Theresa Nicol, who considered Page a good friend, recalled seeing him after dinner on November 4. She "guess[ed]" that she saw him about 8:30 p.m. Although she knew this information was important, she could not recall if she had relayed it to Page's attorney, and in fact had told a police officer in December of 1984 that she had last seen Page at 6 p.m. on the evening of November 4.

Finally, Arnold Henry, another Lothlorien resident, testified that he saw Page in the foyer of the co-op between 8 and 8:30 p.m. on the night of November 4. The prosecution suggested that Mr. Henry confused the night on which this incident occurred, because he also testified that he had seen Bibi at Lothlorien on the night before he saw Page in the foyer. However, on Saturday, November 3, Bibi was either in her apartment or out dancing in San Francisco.

About 11 p.m., one of Bibi's roommates, Meg Luther, called Page at Lothlorien. Page's roommate, Jeff Dlott, answered the phone and shook Page awake. Ms. Luther was concerned that Bibi had not come home that night, and asked Page if he had seen her that evening. Page said he had not and, after he hung up, told Jeff Dlott how he and Robin Shaw had lost Bibi while they were running. He said they had gone back to the car and, while Robin waited for Bibi to return, Page had driven slowly up Skyline Boulevard calling Bibi's name, but had not found her. They discussed what they should do, ultimately decided they needed more information, and went back to sleep.

About 2 a.m. Meg Luther called again; this time she was nearly hysterical. Shortly after Page spoke with her, he got dressed and went to her apartment.

*The Search Begins.*

When Page arrived at her apartment, Ms. Luther called various police departments and emergency rooms. When this proved fruitless, they decided that Page would spend the night in Bibi's room, and that they would file a missing person report in the morning.

The following morning, Ms. Luther called the Berkeley police and an officer came to the apartment. Page told the officer how Bibi had disappeared. He stated that Bibi may have been moody or confused about problems with school, but denied that she was upset or angry the morning of the run.

That evening, the Contra Costa Search and Rescue Unit conducted a "full hasty" search of the Roberts Park area. Approximately 37 persons participated in the search. The resources brought to bear included five bloodhound

teams, fourteen Explorer Scouts, several four-wheel drive vehicles, and two horses.

One of the bloodhounds in the search was "Duke." Duke had participated in approximately 30 searches and was capable of locating a buried body.[1] According to his handlers, when Duke is exposed to the smell of human blood, he howls in a piercing and unmistakable fashion.

After Duke was "scented" with some of Bibi's clothing, he followed a trail which passed within 10 to 15 feet of the area where Bibi's body was ultimately found. However, Duke did not react at that site.[2] The only time Duke reacted was in the parking lot on the other side of Skyline Boulevard.[3]

One of the searchers, Ilir Nushi, talked with Page at the search site to obtain information concerning Bibi's personality and the circumstances of her disappearance. Page told Mr. Nushi how Bibi had disappeared during their run, and described the search he and Robin had conducted. Page said Bibi seemed to be in conflict because she was considering leaving school. Page also said that he and Bibi had argued the night before, because of what Bibi considered to have been a date between Page and another woman.

The search team worked until midnight or 1 a.m., but did not find Bibi's body.

*The "Friends of Bibi Lee."*

When the initial search did not bear fruit, a group of Bibi's friends— including Page—banded together to conduct a more wide-ranging search. They formed an organization—"The Friends of Bibi Lee"—and began by distributing posters throughout the East Bay. Initially, Page and Meg Luther organized the search efforts.

A week later, Patricia Chavez, a volunteer with the Missing Children's Project, arrived on the scene. Ms. Chavez had experience running search

---

[1] In fact, Duke had once located a body that was under 30 feet of water.

[2] The pathologist who did the autopsy testified that there was a strong possibility a pool of blood would have resulted from the injuries Ms. Lee sustained.

[3] The People presented rebuttal evidence that another bloodhound in the search, "Adventurer," had reacted at the burial site. Adventurer's handler testified that the dog began wildly digging at the ground, which is something the handler had never seen a bloodhound do. Adventurer was 10 feet into the brush, pulling on his lead. However, the handler could not see anything with his flashlight and pulled the dog back.

After Bibi's body was discovered, the handler went to the burial site. He recognized the burial site as the very spot where Adventurer had been digging. He concluded he had simply not read Adventurer's signals correctly on the night of the search.

operations and became the primary leader of the search effort. Under her guidance, the search organization set up headquarters in a donated apartment, began systematically getting out the word that Bibi was missing, and set up a phone bank to receive leads.

There was considerable testimony regarding Page's involvement—or the lack thereof—in the search effort during the following month. One search volunteer described his involvement as "sporadic," and others related instances where it seemed Page was less than fully committed to the search effort. Others, however, indicated Page *was* very committed to the search.

*Bibi's Body Is Discovered.*

On December 9, at Pat Chavez's request, the Bay Area Mountain Rescue Unit conducted a walking search of the Redwood Park area. One of the search teams used a German Sheppard trained to search off-leash for the smell of decaying flesh. This dog led its handler to a thicket of bushes near Skyline Boulevard where the handler saw parts of a decomposing human body.

The body—later confirmed to be that of Ms. Lee—was located in a thicket of heavy brush some 36 to 37 feet from the eastern edge of Skyline Boulevard, approximately 700 feet south of the entrance to the Roberts Pool parking area.

The body was resting on its back in a depression caused by its own weight; it had not been buried in a hole. Instead, it was covered with a few inches of dirt and compost material. Small animals had apparently been gnawing at the decomposing flesh, and there were vines growing in the compost material on top of the body. The largely decomposed body was clothed in black and white striped jogging shorts, a blue-green long sleeve shirt, a black T-shirt, and jogging shoes. The shirts were pushed up to the bottom of the breastbone.

There were three open defects in the skin at the back of the head, ranging in size from one to three inches. The back of the skull was severely fractured. There were also two smaller crush type breaks of the rear skull and a "ring" fracture encircling the base of the skull.

The pathologist who performed the autopsy concluded that the fractures to the back of the head were caused by one to three "blunt force traumas." These injuries could have resulted from someone hitting the head with a rock or club, or forcing the head down on a hard stationary object, such as a rock

or tree trunk. The pathologist had never seen injuries similar to those suffered by Bibi resulting from a simple fall backward. The blunt force traumas caused Bibi's death. She probably died within minutes.

The pathologist also found fractures to Bibi's nose bone and right eye socket. These injuries could have been caused by someone administering a backhand blow to the nose, or by kicking, hitting or striking the face with a blunt object. The pathologist found no other injuries.

*Page Learns of the Discovery.*

On the morning of December 9 the Berkeley police telephoned Pat Chavez and told her a body had been discovered. The police did not tell Chavez where the body was found or give any information concerning its condition. Ms. Chavez passed this information on to the other volunteers at search headquarters. Later that afternoon, Page came to the headquarters. He seemed not to know about the body when he arrived. Ms. Chavez told him a body had been discovered, but did not tell him where the body had been found or anything concerning its condition.

The volunteers at headquarters—including Page—did not learn any new facts regarding the body until about 9 p.m. when a Berkeley police inspector called Ms. Chavez and told her the identity of the body had been confirmed by a thumbprint. The inspector did not mention where the body was found or its condition. Ms. Chavez told the group—including Page—that the body was confirmed to be Bibi. She said nothing about where the body was found or how it was dressed.

*Page's Statements and Confession.*

The next morning, December 10, Page and Robin Shaw were asked to come to the Oakland Police Department for questioning.

The case investigators, Sergeant Jerry Harris and his partner Sergeant Lacer, began questioning Page in a windowless interview room at 10:12 a.m. Initially, Page was advised of and waived his *Miranda* rights. (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974].) The officers then questioned Page for approximately one hour, asking general questions about his relationship with Bibi Lee, their time at school together, and the events that occurred on the morning she disappeared. According to Sergeant Harris, this initial interview was not meant to be "probing."

At the end of the initial interview, Harris left the interrogation room to get a tape recorder and to speak with another officer about setting up a polygraph examination for Page. He returned after about 20 minutes, and at 11:50 a.m. began taking the first of 4 taped statements from Page.

In this first taped statement, Page explained how he had met Bibi; he said they had been in love with each other. He explained how he had gone to a party with Jan Carmanotti the night before Bibi disappeared, and had planned to go on a run with Bibi and Robin Shaw the next morning. When he met Bibi the next morning to go running, however, she seemed upset to the point of being irrational. During the drive up to Redwood Park, the mood in the car was "painful." During the run, Bibi was silent and trailed behind Page and Ms. Shaw; the atmosphere was tense. Page remembered last seeing Bibi at the main driveway in Roberts Park. He ran about 100 more yards, looked back, and noticed she wasn't there. He and Robin looked for Bibi in the Roberts Park area, and when they did not find her, they ran back to the car at Skyline Gate to see if she had returned there. They waited at the car for five or ten minutes, and then Page drove south along Skyline while Robin waited at Skyline Gate. Page went as far as Roberts Park, circled both parking lots, and then returned to pick up Robin. He never stopped, got out of the car, called Bibi's name, or honked his horn. He specifically denied going south of Roberts Park or seeing Bibi. The entire search took about 15 minutes.

When Page returned to Skyline Gate, he convinced Robin Shaw to leave without Bibi, telling her he knew Bibi better than she did and that it was his decision. They drove back to Lothlorien, but Page did not tell anyone there about how Bibi had disappeared.

Page also told the officers Bibi had done something similar in the past when she got up abruptly during dinner and had walked outside, and then avoided Page when he attempted to follow her.

The officers repeatedly questioned Page to determine if he was angry at Bibi for disappearing in the park. Page admitted he was upset at the "situation" and didn't want to "give into her." He added that "I told her that I couldn't deal with it the first time . . . she did it to me . . . so I just figured that I had to put an end to this kind of behavior sooner or later." Page specifically denied injuring Bibi.

After Page completed his taped statement at 1:10 p.m., Sergeant Harris—who had some concerns about Page's explanations—asked Page if he would submit to a polygraph examination. Page agreed, and Harris took him to the polygraph office and introduced Page to the polygraph examiner, Sergeant Furry.

Furry administered an examination consisting of a pretest phase, the actual polygraph questioning, and a posttest interview.[4] In the pretest phase, Furry explained to Page how the polygraph worked and told him he would have to be completely truthful in order to pass the test. During this phase, Page indicated he did not know where Bibi's body was found, and did not know what injuries she had received.

After Furry formulated the test questions with Page, he began the polygraph examination with a "searching peak of tension" test. In this test, the examiner, without knowing specific information about the case, asks a variety of questions to determine if there is a response. Here, Furry asked Page if he knew what part of Bibi's body was injured, listing each part— legs, head, stomach, etc.—individually. Page was instructed to answer "no" to each question.

Eventually, Furry turned to the "modified general question technique," which involves asking irrelevant questions mixed in with questions deemed important to the case. In this case, for example, question number four asked whether Page had physically injured Bibi Lee on November 4, and question number six asked whether he had seen Bibi after he left Robin at Skyline Gate. The test measures deception based on the response to the relevant questions. Furry repeated this set of questions twice.

As Furry was asking this set of questions a third time, Page began making crying or "wailing noises" when Furry came to question number four: " 'Did you yourself physically injure Bibi on November 4th?' " Page became so distraught that it was impossible to continue the test. However, when Furry removed the polygraph attachments, he noticed that Page did not exhibit any physical signs of crying.

Sergeant Furry completed two charts for the modified general question technique before Page broke down. Based on these charts, Furry concluded that Page had been deceptive in his responses to question four. As to Page's answers to question six, regarding whether he had seen Bibi after leaving Skyline Gate, Furry deemed the data inconclusive. Furry also felt there had been some response in the "searching peak of tension test" when he had

---

[4]The trial court instructed the jury that "the law does not recognize a conclusion of a polygraph examiner as acceptable evidence for the person's conclusion that the person was untruthful [or] deceptive . . . . [¶] He will testify what it indicated to him. You do not accept that. You can decide independently from all the evidence whether the statements made by Mr. Page were or were not truthful when he talked to the polygraph expert, but you don't rely in any way on the polygraph expert's opinion . . . . [¶] [His] conclusions are not to be accepted by you as corroborating . . . or disputing anything that the defendant said; it's simply that was his opinion."

mentioned injury to the head. Overall, Furry concluded that Page had tested deceptive for the entire test, and specifically told Page he believed he had "attempt[ed] deception" when asked if he had physically injured Bibi.

Furry told Harris and Lacer he believed Page had been deceptive during the examination. Page returned to the interrogation room at 3:15 p.m. and was left alone for about 25 minutes. When Harris returned to the room, Page had his head in his hands and was making a low moaning or wailing sound, and was saying, " 'I really loved her, but, I really loved her.' "

After Page composed himself, the officers continued their questioning. They repeatedly impressed on Page that they believed he had something to do with Bibi Lee's death. Harris said their suspicions were based on, among other things, the fact he had failed the polygraph test, had only superficially searched for Bibi when she was first lost, had convinced Robin Shaw to leave, and didn't tell anyone what had happened when he got back to Lothlorien. When faced with these accusations, Page said " 'Well, if I did do something I must have blacked it out. I might have blacked it out.' "

The officers again said they believed Page was lying, and that they didn't buy his "selective amnesia theory." Lacer suggested that Page close his eyes to try to remember what happened. Page did so and after a moment said " 'I remember hitting and kicking her, and wailing on her, or going off on her,' " but didn't remember when or where this occurred. This admission came at 4:10 p.m., or about six hours after Page had first come to the police station.

The officers repeatedly tried to get Page to give more details about the attack, but he continued to protest that he did not remember any details. The officers said they did not believe him, and told him Bibi's body had been discovered near the area where they had been jogging together. However, the officers did not tell Page precisely where the body was found or anything about its condition.

About 4:30 p.m., Harris decided to try another tack by purposely lying to Page. He told Page they knew he was involved because they had found his fingerprints at the crime scene. This was untrue. Harris also suggested the crime might not be as serious as Page thought, that it might be something less than cold-blooded murder, such as an accidental killing or a killing arising from a quarrel. Page still maintained that he must have blacked out.

The officers continued to "rehash" the reasons they thought Page was lying, but Page stuck to his story that he had blacked out his attack on Bibi. Shortly before 5 p.m., Harris decided to put additional pressure on Page by

telling him a second lie. This time, Harris suggested they had a witness who saw Page's car south of the entrance to Roberts Park. Page responded that his car had not been down there, at least as far as he could recall, and that he must have blacked it out.

At 5 p.m. the officers decided to take a break to get something to eat; Lacer went to get food and left Harris alone in the interview room with Page. Harris and Page relaxed in their chairs, and Page began making casual conversation. He talked about his relationship with Bibi, how she was much brighter than he, and mentioned that he was frustrated with their sexual relationship because she had insisted on coitus interruptus as their only form of birth control. He also mentioned he had a very difficult time after Bibi disappeared. Harris responded that he had been involved in a fatal shooting as a police officer, and that one could recover from such traumas.

Lacer returned at 5:30 p.m. and the officers continued their questioning. They went over their concerns about Page's story "again and again." About 10 or 15 minutes into the resumed interview, Harris told Page he believed he was lying. Harris said he believed Page did go south of Roberts Park, and that he had been involved in Bibi's death. Faced with this direct accusation, Page was silent for a moment. He then said he remembered driving out of the parking lot to Roberts Park and turning left to go south on Skyline. He said that as he drove out onto Skyline, he saw Bibi running or jogging on the opposite side of the road, coming toward him. Page pulled to the opposite side and parked in a turnout in front of Bibi. He got out of the car, took her by the arm, and led her off the road up a little "hill area." As he led her off into a "tree area" he tried to hug and kiss her, to talk to her. When Bibi pulled away, Page became angry and backhanded her, knocking her to the ground. She fell "kind of around a tree." She seemed to be unconscious and her nose was bleeding. Page said he left Bibi there and went home.

Page claimed he drove back up to the same area later that night between 7 p.m. and 1 a.m., and found Bibi lying by the tree. He knew she was dead. He got a blanket from his car and laid down and had sex with her. When he was done, he moved her body closer to Skyline Boulevard where he used a hubcap to cover her with a layer of dirt, smoothing it over so as to give her a "decent burial."

The officers asked Page to repeat this story so they could take notes. He did so.

At 7:07 p.m. the officers began taking a second taped statement from Page. This time, Page essentially related the same story he had just told the

officers. However, many of his responses seemed somewhat confused, tentative or vague. For example, when the officers asked Page if he saw Bibi as he came out of the Roberts Pool parking area, he responded, "I guess I must of." When asked if he had spoken to her when he first stopped her he said, "I must of said something, I don't know." Page said he couldn't remember being in his room after 7 p.m., and although he couldn't remember how he got back to the scene of the killing, he "assumed" he drove. When asked if he had sexual intercourse with Bibi he said "Yeah, I think so." He said he felt he pulled her clothing back on after having sex. Page said he "envision[ed] a slope, little bit of a slope . . . and put her up . . . the slope underneath the branches of the tree." Page said he didn't remember driving home or being home that night. When asked if he had told anyone else this story, Page said he had not, and added that until yesterday he thought, or hoped, Bibi was still alive. Finally, Page claimed that at the time he drove back to get Robin Shaw, he did not remember hitting Bibi, and did not know where she was.

Despite these indications of imperfect memory, Page was very specific regarding many of the details of the assault. He remembered kissing Bibi on the top of her head before he backhanded her with his left hand. He remembered that she fell on her backside by a tree, and that she had a bloody nose. He remembered that when he returned to the crime scene he parked in the same place, but facing the correct direction this time. He remembered propping Bibi's head on a rock when he lay down with her to make love. Finally, he remembered using his hubcap to cover her body with pine needles and a big branch.

Page completed his taped statement at 7:33 p.m. The officers told Page he would be arrested and held in custody for the murder of Bibi Lee. He then agreed to speak with a deputy district attorney.

*Page Recants his Confession.*

Shortly after 9 p.m., Deputy District Attorney Aaron Payne and Inspector Kevin Leong arrived to question Page. This duo took a third taped statement from Page beginning at 9:09 p.m. After being advised of and waving his *Miranda* rights, Page immediately recanted his confession. He told the questioners that his confession had been a product of confusion, fear, and imagination. He again claimed that he never saw Bibi after he left Robin Shaw at Skyline Gate. The interview ended at 9:48 p.m. Payne told Harris Page had recanted his confession, and had claimed it was a product of his imagination.

Page was left alone in the interview room until 11:25 p.m. when he knocked on the door and told Harris and Lacer he wanted to talk. The

officers spoke with Page until about 1 a.m. and then began the fourth and last taped statement. In a rambling statement, Page mentioned a number of factors which caused him to give a false confession: the officers said they found his fingerprints at the scene and were convinced he was involved in the killing; the polygraph scared him; he felt guilty for not having helped Bibi; the officers had said he would sit in jail and rot away from the inside if he could not remember. Because of all these factors, the officers convinced Page that he might have killed Bibi. Consequently, with the officers assistance he "imagined" a scenario in which he could have killed her.

When asked to explain how he had come up with the details of the assault story, Page said the "two things" he knew about the discovery of Bibi's body were that she was found one-quarter mile south of Roberts Park, and that at least the bottom of her was dressed. He surmised that since the dogs did not find her, she must have been buried. He also "assumed" she was found on the east side of the road.[5]

After this final interview, Page was arrested and charged with the murder of Bibi Lee.

*Defense Case*

The defense called Karen Marquardt, who claimed to have seen Bibi Lee struggling with a man near the Warren Freeway shortly after she disappeared. On November 4, 1984, Ms. Marquardt was returning from church. Just after noon, she drove up Park Boulevard and turned right (south) onto Monterey, a street which leads to an entrance to the Warren Freeway. This area is approximately two miles (as the crow flies) from Roberts Park. As she was making the turn, Ms. Marquardt saw a Caucasian man and an Asian woman struggling by the side of the road. The woman was wearing jogging shorts and a long sleeve T-shirt. The man was pulling the woman up a slope toward a van parked up the street. He had both of his hands on one of her arms. She described him as white, in his mid-40's, 6 feet to 6 feet 3 inches, 220-250 pounds with a prominent beer belly, beard and unkempt curly hair.

A few days later, Ms. Marquardt saw a newscast on television which flashed a picture of Bibi Lee and requested information regarding her disappearance. Ms. Marquardt called the police and, based on a photograph, said she believed Bibi Lee was the woman she had seen on the side of the road. At trial, she also identified a photograph of Bibi Lee as that of the woman she had seen by the side of the road.

[5]Page admitted later in the statement that he did not know how Bibi had died.

*Page's Testimony.*

Page took the stand in his defense. After he discussed his personal history and the development of his relationship with Bibi Lee, he turned to the events of November 4, 1984. His description of the trip to Redwood Park and the jog generally paralleled Robin Shaw's testimony regarding those events. Page testified that after they lost Bibi at Roberts Park and returned to the car at Skyline Gate, he drove back along Skyline to Roberts Park while Robin remained at Skyline Gate. Page drove south on Skyline at about 25 miles per hour, turned left into the Roberts Park parking area, circled the parking lots, and then came back out onto Skyline. He turned right (north) and drove straight back to Skyline Gate. He never got out of the car. Bibi was not at Skyline Gate when he returned, and after waiting about 10 or 15 minutes Page surmised that Bibi had "thrown a snit and taken off," as she had done once in the past. He was not worried about her because he assumed this was merely a repeat performance.

Page did not have a clear memory of what he did that evening after he returned to Lothlorien from the trip to the Exploratorium, but he believed he stayed in all evening and went to sleep about 10 p.m.

Page described his considerable involvement in the search efforts over the next five weeks, and then turned to the events surrounding the discovery of Bibi's body and his statements to the police.

On the day Bibi's body was discovered, Page came to the search head-quarters about 3 p.m. to drop off some food. He found a note on the door saying, "Meeting in Progress. Do not disturb." He left the food at the door.

When Page got back to Lothlorien about 4 p.m., a housemate told him that a body had been found in the park. He went to his room and found a message to call Pat Chavez, which he did. She scolded him for not having returned her call earlier and told him to come to search headquarters. When he arrived at the headquarters, Pat told him a body had been found, and that identification was pending. Page stayed at the headquarters with a group of volunteers, and heard one of them say that the " 'clothes seem[ed] to match.' " A while later, Pat Chavez received a phone call. When she hung up, Page heard her say " 'Dammit,' . . . 'she still had her shoes on, dressed from the waist down.' " About 20 or 30 minutes later, Page learned that the identity of the body had been confirmed through a thumbprint. This was the only information Page learned about the body until he arrived at the police station the next day.

Page testified at length about the events at the Oakland Police Department on December 10. According to Page, after he completed the polygraph,

Harris and Lacer told him they knew he had killed Bibi because witnesses had seen his car south of Roberts Park, his fingerprints were at the scene, and he had " 'flunked the polygraph.' " When he adamantly denied this charge, Harris said, " 'You're lying.' "

Because of the pressure he had been under and the information provided by the officers, Page began to question his own perception of reality. He repeatedly told Harris and Lacer he didn't remember seeing Bibi or harming her. However, each time he did so, the officers would respond with their doubts about his story: How could he go off and leave the woman he loved? Why did he fail the polygraph? What about the witness who had seen his car south of Roberts Park?

At the officers' urging, Page began to imagine how he might have been involved in Bibi's death. He had an image of making love to Bibi, and the officers urged him to continue imagining what had happened. When his memory drew a blank, one of the officers said, " 'Well, you might remember after lashing out or going off or exploding.' " Page said he had an image of "going off." They asked Page if he had hit Bibi, and he said he pictured that. They asked if he kicked her, and he said he could imagine that. They asked if he had a branch, and he pictured that. They asked if he had a rock, and he put a rock into the scenario. Page claimed the process was "like making a movie."

Page testified at length about how the details of his "confession" were developed with the officers' help. When the officers asked if he hit her on the head, he said he might have slapped her. When they asked if she had a bloody nose, he said he saw a trickle. When asked if she fell down, Page said he could "see" her falling around a tree.

The officers then turned to how he disposed of the body. The officers asked if he had moved her, and Page said he had moved her up on a rock. He said she was still groggy and he lay down next to her and comforted her, and that after awhile they fell asleep. When the officers asked how long that would have taken, Page said an hour and one-half. They suggested that this didn't fit in with the other evidence, because he had left Robin waiting only 15 to 20 minutes. The officers then helped Page figure out when he could have come back. They decided it must have been sometime after dinner, since that was the only time open.

Page decided that Bibi must have been dead when he returned, otherwise he would have helped her. Lacer asked, " 'You made love to a dead body?' " Page responded, " 'That's what fits.' " The officers asked if he had moved

the body, and he responded that he guessed he must have. He pictured putting her under a branch, because they had asked him about a branch earlier. They asked if he covered her, if he had dug a depression, and he responded that he might have had a shovel. Lacer said, " 'You don't have a shovel, do you?' " and asked Page what he had in his car. Page answered that he had a hubcap and a blanket, and he incorporated those items into the story.

After running through the story once, Page and the officers went back over it again to "get it straight." In the second run-through, they determined where Page first saw Bibi, where he parked, and how he had gotten Bibi off the road.

After this second run-through, Page gave the taped confession described above. Page did not believe he was taping his "memories"; instead, he understood he was giving this statement " 'so that as the physical evidence [came] in [the officers could] have something to gauge against it.' "

*Defense Expert Testimony.*

As his final witness, Page called Elliot Aronson, a professor of psychology at the University of California, Santa Cruz. Generally,[6] Professor Aronson testified concerning factors which can lead a person to give an inaccurate statement in an interrogation setting. According to the professor, a person may give inaccurate information when an authority figure lies to the person questioned, or puts that person under severe stress, or causes the person to feel guilty, or makes the person questioned feel he can't trust his own senses and memory. These factors may throw the person "off balance" and make him temporarily vulnerable to persuasion. Professor Aronson gave examples of experiments in social psychology which illustrated how each of these factors could influence a person to give inaccurate information and make him more vulnerable to suggestion.

Although the trial court permitted Professor Aronson to testify concerning these general principles of social psychology, the court did not allow the professor to specifically relate these principles to Page's statements, or to give his opinion concerning the reliability of the confession.

The jury deliberated for six days on this evidence before returning a guilty verdict.

---

[6] Professor Aronson's testimony is described in greater detail in the Discussion section of this opinion, where we address Page's argument that the court improperly restricted Aronson's testimony.

## II

### DISCUSSION

A. *The Restrictions on the Defense Expert Testimony.*

Page contends the trial court erred when it restricted Professor Aronson's testimony. He argues the trial court should have permitted Professor Aronson to specifically discuss the particular elements in the taped statements which indicated the confession was unreliable, and should have allowed the professor to give his opinion regarding the overall reliability of the confession. Page contends the court's restriction of this crucial defense testimony violated his federal constitutional right to present a complete defense, and was also improper under the state Evidence Code. We reject both arguments.

1) *The Proposed Testimony.*

Near the end of trial, defense counsel notified the court that he intended to call Professor Aronson of the University of California, Santa Cruz as a defense expert on persuasion and conformity. Counsel said Aronson "would be commenting on certain elements, characteristics that he has found in [the taped statements] that would have a bearing on" the accuracy and reliability of the confession. He added that Aronson would not be drawing "ultimate conclusion[s]," but would merely point out information not ordinarily within the knowledge of a layperson, and would support his opinions with evidence of studies and experiments in the field of social psychology.

The prosecutor objected to the testimony on *Kelly-Frye*[7] grounds. Although the trial court was dubious that *Kelly-Frye* applied in this situation, it nevertheless ordered defense counsel to make an "offer of proof" outside the presence of the jury so the court could determine whether the evidence was admissible.

At the in camera hearing, Professor Aronson delineated his extensive credentials as a social psychologist.[8] He explained that social psychology deals with interpersonal relationships, and that his particular area of expertise is persuasion, interpersonal communication, and conformity. He explained that social psychologists do not make predictions about what a

_____

[7]*People* v. *Kelly* (1976) 17 Cal.3d 24 [130 Cal.Rptr. 144, 549 P.2d 1240]; *Frye* v. *United States* (D.C. Cir. 1923) 293 F. 1013 [54 App.D.C. 46, 34 A.L.R. 145].

[8]Professor Aronson received his Ph.D. in psychology from Stanford in 1959, and has been a professor at major universities (including Harvard and the University of Minnesota) ever since. He is presently professor of psychology at UC-Santa Cruz, where he is director of the graduate program in social psychology. He has published 14 books—including a popular textbook in the field—and more than 100 scholarly articles.

particular individual will do in a given situation, but instead predict what most people will do.

Professor Aronson had listened to the tapes of the statements Page made to the police on December 10 and 11, but knew nothing else about the case. In listening to the tapes, Aronson identified certain characteristics of the interrogation that may have influenced the reliability of Page's confession.

Generally, Professor Aronson noted that when a trusted authority figure misleads or lies to another person, or puts that person under stress, or makes him feel guilty or doubt his own perceptions, it throws the other person off balance and makes him vulnerable to persuasion. Moreover, when a person is confronted with what seems like incontrovertible evidence that contradicts his own senses or memory, the person will struggle to make sense of the situation.

With respect to Page's interrogation, Aronson found a number of important factors at work: It was clear that Lacer and Harris were authority figures; Page seemed to believe they were being completely honest with him, and he seemed to be trying to please them; however, the officers lied to Page about the fingerprints and the eyewitness, and Page was struggling to make sense of this information.

Professor Aronson identified other factors in the taped statements affecting the reliability of the confession. First, Page seemed to feel guilty about having left Bibi in the park. According to the professor, Sergeant Lacer "made that guilt salient, in effect rubbed the defendant's nose in the guilt." Second, Page exhibited "a lot of stress and confusion" related to the ordeal of the previous five weeks. Third, the fact Lacer and Harris did not believe his story was, in itself, a very stressful event. Fourth, Page was alone in the interrogation with no support. And fifth, the police frightened Page when they told him he would spend the rest of his life in prison unless he "came up" with something.

According to Professor Aronson, "there is a lot of research in . . . the field of conformity compliance persuasion that shows that under these kinds of circumstances, people strive to make sense out of the discrepancies. They try to construct scenarios that link these disparate elements together. They're compliant. They tend to tell people what they think they want to hear, and they're susceptible. They tend to go along."

Aronson then gave examples of experiments in which subjects had succumbed to social pressure and given responses which contradicted their own

senses. In one experiment, the subject was placed in a room with three other college students and asked to identify one of three lines as being closest in length to a model line. This is a simple perceptual task, which the subjects completed with near 100 percent accuracy when left on their own. However, when the other students (who were in league with the experimenter) uniformly picked another (incorrect) line as the correct one, the subject conformed in 75 percent of the cases.

Aronson noted that one of the interesting things about this and similar studies is that the subjects are tentative in their selection of the line when they have been influenced by others. Aronson found similar tentativeness in Page's confession, and gave specific examples from the confession tape. (See Facts, *ante*, at pp. 175-176.)

During the hearing, Professor Aronson reviewed other social science experiments which he deemed relevant. One demonstrated how a feeling of guilt tends to "soften[] [people] up to conformity and compliance";[9] another showed how an authority figure can persuade a person to espouse a position contrary to their own beliefs;[10] and another showed how one's perception of one's ability to resist the influence of authority figures is grossly overinflated.

This last experiment is the famous work performed by Stanley Milgram at Yale. Dr. Milgram investigated the extent to which an average person can be persuaded to administer pain to or injure another person at the direction of an authority figure. In the experiment, a deceived subject was led to believe that, as part of an experiment in learning, he would inflict severe electric shock to another person, and perhaps kill that person, if the procedure were followed to its conclusion.

A group of psychiatrists was surveyed prior to the experiment and indicated that only about 1 percent of the population would take the shock

---

[9] In this experiment, the subject was brought into the laboratory to perform a simple, irrelevant task. Some of the subjects were made to feel guilty by making them believe they had hurt another student (or, in one experiment, by making them believe they had knocked over a stack of IBM cards meticulously arranged by the experimenter). When the students were asked to volunteer to assist the experimenter with a tedious task, such as making many phone calls, only 25 percent of the control group agreed to help, while 75 percent of the "guilty" group agreed.

[10] In this experiment, a group of college students were secretly chosen because of their avowed belief that marijuana is a dangerous drug which should not be used by anyone. Those students—who did not know the reason they had been chosen—were then asked by the experimenter (a "prestigious person") to make a videotape arguing for the legalization of marijuana. The videotape was ostensibly to be used in conducting research on high school students who hadn't made up their minds about marijuana. About 80 percent of the anti-marijuana students agreed to make the tape.

severity to its highest level. When the experiment was conducted, however (and as it has been replicated in many countries), more than 60 percent of the persons tested were willing to administer shocks up to the point where they believed the other person may in fact have been seriously injured or killed, if they were directed to do so by the "authority figure" conducting the experiment.

Professor Aronson tied this experiment into the reliability of Page's confession by observing that "when we see or read about someone confessing . . . [to] things that most of us would find terribly obnoxious like having sexual intercourse with a dead body, we say to ourselves, 'My God, I would never confess to this if it weren't true.' . . . But in my opinion, that's exactly what people say when we present them with this Milgrim [*sic*] experiment. And yet we know that somewhere between 60 and 70 percent of the entire population would go all the way."

Defense counsel then attempted to ask Professor Aronson if he had an opinion as to the reliability or accuracy of the statements made by Page. The trial court sustained the prosecutor's objection to this question.

2) *The Trial Court's Rulings.*

Professor Aronson's proposed testimony fell into three general categories: (1) the general psychological factors which might lead to an unreliable confession, along with descriptions of the supporting experiments; (2) the *particular evidence* in Page's taped statements which indicated that those psychological factors were present in this case; and (3) the reliability of Page's confession, given the overall method of interrogation. Although the trial court's rulings are somewhat obtuse, it appears the court permitted testimony from the first category only, and excluded evidence from the other two categories.

3) *The Trial Testimony.*

Professor Aronson's trial testimony paralleled his testimony at the in camera hearing, except he did not refer specifically to the tapes and was not asked to venture an opinion as to the reliability of Page's responses. Instead, after he detailed his qualifications and experience, his testimony was limited to a discussion of the general factors (discussed above) which may influence

a person to give a false confession, general examples of those factors,[11] and an explanation of the relevant experiments.[12]

At the conclusion of Professor Aronson's testimony, the trial court advised the jury that the professor had not expressed any opinion regarding the reliability of Page's statements because the court would not permit him to do so.[13]

Although the trial court prevented Professor Aronson from providing a direct link between the general principles he discussed and Page's confession, defense counsel made that connection in closing argument.

### 4) *There Was No Constitutional Error.*

■ Page first contends that the restrictions on Professor Aronson's testimony violated his Sixth and Fourteenth Amendment right to present a complete defense. We disagree.

Page's primary authority for his constitutional argument is *Crane* v. *Kentucky* (1986) 476 U.S. 683 [90 L.Ed.2d 636, 106 S.Ct. 2142] (*Crane*). In *Crane*, the defendant moved to suppress a confession. The trial court conducted a hearing, determined that the confession was voluntary, and denied the motion. At trial, the defendant attempted to introduce testimony about the physical and psychological environment in which the confession was obtained, in order to prove that the confession was unreliable. The trial court concluded that the evidence pertained solely to the issue of voluntariness and was therefore inadmissible. The United States Supreme Court reversed, holding that the ruling deprived the defendant of his Sixth and Fourteenth

---

[11] With respect to the specific factors, Professor Aronson cited a police officer as one type of trusted authority figure. With respect to the "guilt" factor, Professor Aronson gave an example of losing his grandchild on the beach when he was supposed to have been watching him; this would cause guilt feelings. Finally, he explained that receiving information directly contrary to one's memory or senses creates confusion and makes a person "vulnerable to persuasion."

[12] With respect to the experiments, Professor Aronson emphasized that the subjects who gave answers contrary to their own senses were tentative in their responses. He also emphasized the Milgram experiment as evidence that people greatly overestimate their ability to resist pressure from an authority figure.

[13] Specifically, the trial court advised the jury that: "I permitted this testimony . . . simply because I felt that most of us have not had exposure to the behavioral sciences, certain *investigations that have been made in the behavioral sciences, to give us as a background consideration that you can use in evaluating the testimony in this case* . . . it's not the same as other testimony you've had which is focusing specifically to factual issues that you've heard. But I want to put the limitation he's expressed no opinion. You can't say that he has expressed an opinion about anything you've heard because he hasn't. I wouldn't permit him to."

Amendment right to present a complete defense. (*Id.*, at pp. 684, 690-691 [90 L.Ed.2d at pp. 641, 644-646].)

In reversing the lower court, *Crane* first noted that evidence about the manner in which a confession is secured is relevant to its credibility, as well as to its voluntariness. (476 U.S. at p. 688 [90 L.Ed. at p. 643].) Thus, a finding that the confession is voluntary does not render such evidence irrelevant or inadmissible. Rather, "evidence about the manner in which a confession was secured will often be germane to its probative weight, a matter that is exclusively for the jury to assess." (*Ibid.* [90 L.Ed.2d at p. 644].)

The court went on to note that if the defendant is "stripped of the power to describe to the jury the circumstances that prompted his confession, [he] is effectively disabled from answering the one question every rational juror needs answered: If the defendant is innocent, why did he previously admit his guilt?" Consequently, the court concluded that where the prosecutor's case is based on the defendant's confession, the defense must be permitted to delve into the circumstances under which the confession was secured. (*Crane, supra*, 476 U.S. at p. 689 [90 L.Ed.2d at p. 644].)

Nevertheless, the *Crane* court was careful to remind defendants that even in this context trial courts retain " 'wide latitude' " to exclude repetitive, marginally relevant, or confusing evidence. (*Crane, supra*, 476 U.S. at p. 689 [90 L.Ed.2d at p. 644].) *On the facts before it*, the court concluded that "the *blanket exclusion* of the proffered testimony about the circumstances of petitioner's confession deprived him of a fair trial." (*Id.*, at p. 690 [90 L.Ed.2d at p. 645], italics added.) Thus, in *Crane* it was the "blanket exclusion" of evidence which deprived the defendant of " 'a meaningful opportunity to present a complete defense.' " (*Ibid.*, quoting *California* v. *Trombetta* (1984) 467 U.S. 479, 485 [81 L.Ed.2d 413, 419, 104 S.Ct. 2528].)

There are obvious and important differences between this case and *Crane*. Here, the trial court permitted Page and the prosecutor to thoroughly explore the physical and psychological environment in which the confession was obtained. Among other things, the jury learned that: Page was questioned by two police sergeants, both of whom were thoroughly cross-examined on the method of interrogation; the police lied to Page to extract his confession; the officers made him feel guilty; Page took and failed a polygraph exam; and Page had only recently learned of Bibi's death. The jury also knew Page's educational level and physical condition. With respect to the physical circumstances of the interrogation, the jury knew the size and layout of the interrogation room (through testimony and pictures), how long the interrogation sessions lasted, when Page ate, when he drank water, and used the

restroom or the telephone. In short, the defense and prosecution painted a detailed picture of the physical and psychological circumstances of the interrogation.

In addition, Page presented his own version of the interrogation (which differed markedly from the version proffered by the prosecution) and explained in detail how the "confession" came about. Finally, the court permitted Professor Aronson to testify as to the psychological factors which could lead to a false confession. Although *the professor* did not explicitly link those factors to Page's confession, the link was obvious, and was explicitly made by defense counsel in closing argument.

In short, the restriction on Professor Aronson's testimony is a far cry from the "blanket exclusion" of evidence the Supreme Court faced in *Crane.* Unlike Crane, Page was not "stripped of the power to describe to the jury the circumstances that prompted his confession." (*Crane, supra,* 476 U.S. at p. 689 [90 L.Ed.2d at p. 644].) In the present case, that power was, at most, marginally curtailed. Consequently, in our view, the trial court's ruling did not deprive Page of " 'a meaningful opportunity to present a complete defense.' "[14] (*Id.,* at p. 690 [90 L.Ed.2d at p. 645].)

We find support for our interpretation of *Crane* in a lower federal court opinion. In *United States* v. *Miliet* (5th Cir. 1986) 804 F.2d 853, the defendant was charged with conspiring to distribute cocaine. During questioning by police, the defendant asked for a definition of conspiracy. He allegedly understood the definition the police provided to include mere presence at the scene of a crime and consequently admitted they had "got [him] on conspiracy." (*Id.,* at pp. 855, 858.) When defense counsel attempted to question the interrogating officer about what he had told the defendant concerning the elements of a conspiracy, the trial judge intervened and cut off further questioning. On appeal, the defendant relied on *Crane* to argue that the court's action deprived him of a fair trial. In rejecting the argument, the Fifth Circuit noted that "[t]wo factors were critical to the Court's determination in *Crane.* First, *the excluded evidence was all but indispensable to the petitioner's principal theory of defense.* Second, the trial court failed to advance any rational justification for its wholesale exclusion of potentially exculpatory evidence." (*Miliet, supra,* at p. 859, italics added.)

Here, as in *Miliet,* the excluded testimony was not "indispensable" to Page's principal theory of defense. The court permitted Page to introduce all

---

[14]We do not mean to imply by our holding that there is no constitutional error whenever "some" evidence concerning the circumstances of a confession is admitted. Certainly, there is a constitutional threshold which requires that a trial court provide the defendant a fair opportunity to explore such evidence. However, we are confident the restrictions imposed here pass constitutional muster.

the elements of his defense, including the expert testimony. The restrictions imposed by the court merely affected *the way* the defense could link the theories presented by the expert to the evidence introduced at trial. It did not prevent it from making that connection.[15]

### 5)  *The Trial Court Did Not Abuse Its Discretion When It Restricted the Expert Testimony.*

██    Page next contends that even if there were no constitutional error, all of Professor Aronson's proffered testimony should have been admitted under the provisions of the Evidence Code. We disagree.

██    As a general rule, a trial court has wide discretion to admit or exclude expert testimony. (*People* v. *McDonald* (1984) 37 Cal.3d 351, 373 [208 Cal.Rptr. 236, 690 P.2d 709]; *People* v. *Clark* (1970) 6 Cal.App.3d 658, 664 [86 Cal.Rptr. 106].) An appellate court may not interfere with the exercise of that discretion unless it is clearly abused. (*Clark, supra,* at p. 664.)  ██    Here, the court did not abuse its discretion when it limited Professor Aronson's testimony.

Evidence Code section 801 sets out the primary guideline for determining what constitutes appropriate "expert opinion" testimony: "If a witness is testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is: [¶] (a) Related to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact . . . ."

In deciding to admit Professor Aronson's testimony, the trial court relied on *People* v. *McDonald, supra,* 37 Cal.3d 351 as the most analogous authority. In *McDonald,* the Supreme Court concluded the trial court had abused its discretion when it excluded *all* expert testimony on the psychological factors

---

[15]In connection with his constitutional argument, Page cites a number of cases which "recognize" that false confessions occur. (*United States* v. *Roark* (11th Cir. 1985) 753 F.2d 991, 994-995; *United States* v. *Smith* (9th Cir. 1981) 638 F.2d 131, 133-134; *State* v. *Sawyer* (Fla.Dist.Ct.App. 1990) 561 So.2d 278; *People* v. *Hamilton* (1987) 163 Mich.App. 661 [415 N.W.2d 653, 654-655]; *Reilly* v. *State* (1976) 32 Conn. Supp. 349 [355 A.2d 324, 336-337].) He apparently cites these cases not because they have any direct bearing on the legal issues raised in this case, but as support for his request that we "recognize . . . that false confessions do occur and that police interrogation techniques, designed to break down the resistance of guilty persons, can have an unfortunate by-product—a false confession."

We, of course, recognize *the possibility* that a person may falsely confess to a crime. However, our recognition of this possibility is of only marginal importance to this case. What is important is that the jurors found Page's confession genuine, despite his considerable effort to convince them to the contrary. We may reverse this determination only if there was prejudicial error at trial.

affecting the accuracy of eyewitness identification. (*Id.*, at p. 376.) The Supreme Court reasoned that "the body of information now available on these matters is 'sufficiently beyond common experience' that in appropriate cases expert opinion thereon could at least 'assist the trier of fact' (Evid. Code, § 801, subd. (a))." (*McDonald, supra*, at p. 369, fn. omitted.)

However, *McDonald* did not hold that a court must permit the expert to discuss the particular evidence in the case or give his opinion on the reliability of particular eyewitness testimony. To the contrary, the court said such expert testimony "cannot be excluded in *wholesale* fashion merely because the trial would be simpler without it." (*People* v. *McDonald, supra*, 37 Cal.3d at p. 372, italics added.) Moreover, the court seemed to indicate the expert would usually be limited to discussing general factors bearing on the accuracy of eyewitness testimony in a "typical case." The court observed that "[t]he expert testimony in question does *not* seek to take over the jury's task of judging credibility: . . . it does not tell the jury that any particular witness is or is not truthful or accurate in his identification of the defendant. Rather, it informs the jury of certain factors that may affect such an identification in a typical case; and to the extent it *may* refer to the particular circumstances of the identification before the jury, such testimony is limited to explaining the potential effects of those circumstances on the powers of observation and recollection of a typical eyewitness." (*Id.*, at pp. 370-371, second italics added.)[16]

Here, the trial court followed *McDonald*'s lead and limited Professor Aronson's testimony to a discussion of "certain factors that may affect [the reliability of a confession] in a typical case." (*People* v. *McDonald, supra*, 37 Cal.3d at p. 370.) In our view, nothing in *McDonald* or the Evidence Code required the court to permit Professor Aronson to discuss the particular evidence in this case or to give his opinion regarding the overall reliability of the confession.

█ Finally, as Page himself admits, an expert witness may so thoroughly educate a jury regarding applicable general principles that "the factual issues in the case become ones that the jurors can answer as easily as the expert." In other words, an expert's thorough description of the general principals to be applied in a given case may make additional (and more specific) expert testimony superfluous. (*People* v. *Wilson* (1944) 25 Cal.2d 341, 349 [153 P.2d 720]; *People* v. *Brown* (1981) 116 Cal.App.3d 820, 827 [172 Cal.Rptr. 221]; *People* v. *Todd* (1969) 1 Cal.App.3d 547, 553 [81 Cal.Rptr. 866];

---

[16]Four years after *McDonald*, the Supreme Court held that a proper instruction on eyewitness identification factors should list the factors supported by the evidence in a "neutral manner." (*People* v. *Wright* (1988) 45 Cal.3d 1126, 1141 [248 Cal.Rptr. 600, 755 P.2d 1049].)

*People* v. *Arguello* (1966) 244 Cal.App.2d 413, 417-418, fn. 4 [53 Cal.Rptr. 245].) In such a case, " '[t]here is no necessity for [additional expert] evidence, and to receive it would tend to suggest that the judge and jury may shift responsibility for decision to the witness[].' " (*Arguello, supra,* 244 Cal.App.2d at p. 419, quoting McCormick on Evidence, § 12, p. 25.)

Thus, in *People* v. *Brown, supra,* 116 Cal.App.3d 820, the Court of Appeal found error where a police officer testified concerning the definition of a heroin "runner,"[17] and then went further to render an opinion that the defendant in the case was in fact a "runner" under the definition provided. (*Id.,* at pp. 828-829.) The court concluded: "The term 'runner' having been defined for them, the jury were as qualified as the witness to determine whether Brown was 'working as a runner . . . .' " (*Id.,* at p. 829.)

Similarly, in the present case, Professor Aronson outlined the factors which might influence a person to give a false statement or confession during an interrogation. Having been educated concerning those factors, the jurors were as qualified as the professor to determine if those factors played a role in Page's confession, and whether, given those factors, his confession was false.

In sum, we conclude the trial court did not abuse its discretion when it limited Professor Aronson's testimony.

### 6) *Even If the Court Did Abuse Its Discretion Any Error Was Harmless.*

Exercising an abundance of caution, we note that even if state law compelled the trial court to admit all of Professor Aronson's testimony, any error would be harmless under the standard articulated in *People* v. *Watson* (1956) 46 Cal.2d 818 [299 P.2d 243]. In other words, it is not reasonably probable Page would have obtained a more favorable result had all of Professor Aronson's proffered testimony been admitted at trial. (*Id.,* at p. 836; see *People* v. *McDonald, supra,* 37 Cal.3d at p. 376.)

First, despite Page's claim to the contrary, the prosecution's case did not rely solely on his naked confession. In reality, the confession was supported and corroborated by the internal details Page supplied—details that only the killer could know, such as the location of the body, the location of injuries (head and nose), and the method of burial. True, Page claimed he was "fed"

---

[17] The officer defined a "runner" as " 'an individual who does not personally possess a quantity of heroin; however, he frequents the immediate area of people who do, and a runner will seek out customers, direct them to the person that is dealing and will be paid back either in money or, more normally, by them receiving a balloon themselves . . . .' " (*People* v. *Brown, supra,* 116 Cal.App.3d at p. 828.)

all this information in creating his confession; however, we believe Page's explanation strained the jury's credulity to the breaking point. His explanation was rife with internal inconsistencies, and was also inconsistent with the explanation he gave the officers in his final taped statement.

Second, although Professor Aronson did not explicitly make the connection between the general psychological principles he discussed and the specific evidence in Page's case, defense counsel did make that connection in closing argument. Moreover, the connection was obvious and was clearly the main thrust of the entire defense case. The jurors would had to have slept through most of the defense testimony to miss it.

Finally, Page complains that because Professor Aronson was prevented from expressing any opinions favorable to his case, "some of the jurors may have wondered why he had not done so and concluded that no favorable opinions existed." This fear is not supported by the record. The trial court specifically told the jury Professor Aronson had not rendered any opinions because *the court* would not permit him to do so. Moreover, the overall tenor of Professor Aronson's testimony was clearly favorable to the defense. Finally, we must ascribe some common sense to the jury. Why would defense counsel call Professor Aronson to the stand *unless* his overall view of the case was favorable to the defense cause?

In sum, we conclude that even if error did occur, it was not prejudicial.

B.-D.*

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

E.   *Disposition.*

The judgment is affirmed.

Merrill, J., and Chin, J., concurred.

A petition for a rehearing was denied January 27, 1992, and appellant's petition for review by the Supreme Court was denied March 26, 1992.

---

*See footnote, *ante,* page 161.