849 A.2d 209 (2004)
369 N.J. Super. 424
STATE of New Jersey, Plaintiff-Respondent,
v.
Shamsid KNIGHT, Defendant-Appellant.
State of New Jersey, Plaintiff-Respondent,
v.
Shamsid Knight, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Submitted February 10, 2004.
Decided May 28, 2004.
*211 Yvonne Smith Segars, Public Defender, attorney for appellant in both appeals (Michael C. Kazer, Designated Counsel, on the brief).
Peter C. Harvey, Attorney General of New Jersey, attorney for respondent in A-2933-02T4 (Maura K. Tully, Deputy Attorney General, of counsel and on the brief).
Paul T. Dow, Acting Essex County Prosecutor, attorney for respondent in A-4099-02T4 (Gary A. Thomas, Special Deputy Attorney General, of counsel and on the brief).
Shamsid Knight, appellant, submitted a supplemental pro se brief.
Before Judges PRESSLER, CIANCIA and PARKER.
*210 The opinion of the court was delivered by PARKER, J.A.D.
In these back-to-back appeals, we once again address the parameters for interrogation of suspects in police custody and the totality of circumstances that render a confession inadmissible. Defendant appeals from convictions arising out of two separate indictments, one charging him *212 with murder and related offenses,[1] and the other with conspiracy and five robberies unrelated to the murder allegation.[2] Defendant's confessions to the murder and robberies came during a marathon interrogation under unusual circumstances. His motions to suppress the confessions were denied in both cases. We reverse the convictions on both indictments and remand for new trials.
The story begins on January 24, 2001, at approximately 3:00 a.m., when Kim Smith heard a car horn and a man yelling outside her Newark home. From her window, Smith saw defendant, whom she had known since he was a young child, standing next to a Lincoln Navigator (SUV), yelling for her son. Smith called 9-1-1 because she was frightened by defendant's behavior. After Smith called the police, she saw defendant get back into the SUV.
As the police officers arrived at Smith's home, they saw the SUV pull out of the driveway, turn left onto Park Street, and stop at the intersection of Park and Ridge Streets. The officers attempted to stop the SUV with their lights and siren. When the vehicle did not stop, they used the microphone to tell the driver to pull over, turn off the engine and place his hands out the window. The driver, Andrew Casimir, did as instructed. As one of the officers walked toward the SUV, he heard three or four gunshots fired from the passenger side, thought the shots were directed toward him, and returned fire. The officers heard another shot as the SUV suddenly moved away from the curb, swerved down the street about two or three blocks and struck the median. When the SUV stopped, the pursuing officers saw a hand holding a black revolver out the window. As they approached the now-stopped vehicle, they saw Casimir slumped over the steering wheel with blood coming from his head. Defendant was in the passenger seat, from which he had attempted to drive the SUV. He was ordered to drop his gun, get out of the SUV and lie down on the ground. When he got out of the SUV, he was wearing only a short-sleeved T-shirt and jockstrap. He wore no jacket, pants, shoes or socks. He was handcuffed and escorted to a patrol car.
At 5:10 a.m., approximately two hours after the shooting, Homicide Investigator, Richard Gregory, of the Essex County Prosecutor's Office, and Sergeant John Melillo, of the Newark Police Department, arrived at the scene. It was cold, dark and there was snow on the ground. They saw Casimir's body still slumped in the driver's seat of the SUV and a revolver and a cell phone on the ground next to the driver's door. Melillo saw the passenger door standing open with articles of blood-stained clothing scattered on the ground. Defendant was seated in the back of a patrol car still wearing only the Tshirt and jockstrap.
Sometime thereafter, defendant was taken to Newark Police Headquarters for interrogation. By the time he arrived, defendant *213 was wearing the jockstrap, the short-sleeve T-shirt under a red plaid flannel shirt, and no shoes or socks. The clothes that had been scattered around the SUV had been taken for DNA testing, as were the shirts defendant was wearing when he arrived at headquarters. He was given a hospital gown to wear over the jockstrap and a pair of socks.
At the suppression hearing on the murder indictment, Gregory testified that when he saw defendant again at police headquarters, defendant was in the presence of several officers, and was "rapping and rocking" to himself, saying his name in a strange, "wired" way. He indicated that defendant had been given his Miranda[3] warnings when first taken into custody and again at headquarters when the officers began questioning him. No written waiver was signed at the time, however, and Gregory proceeded to question defendant for "hours." The first Miranda waiver was signed at 12:10 p.m. Gregory testified that the questioning was not continuous and that he gave defendant a bag of chips and a soda during the interrogation.
Defendant testified that he was removed from the passenger side of the SUV by police and held on the ground with an officer's knee in his back before he was handcuffed. The weather was very cold, and he was wearing only the jockstrap. After he was handcuffed, he was escorted to one of the police vehicles where he was placed in the back seat, but never given a blanket or anything to cover himself. He testified that he had been smoking marijuana earlier that day and could not recall the last time he had eaten or gotten any sleep before he was arrested.
When he was placed in the interrogation room at headquarters, defendant was handcuffed to a chair by one hand. He testified that "[t]here was an influx of detectives coming in and asking me questions." In response to his answers, the officers told him, "That's not what we want to hear," and ordered him to tell them what actually happened. Defendant testified that the officers said they had photographs from a surveillance camera at a nearby gas station showing him firing the gun. He claimed he was not permitted to call his grandfather when he asked to do so; was not given anything to eat or drink; and was not permitted to use the bathroom, but was given a soda can to urinate in. Defendant testified that he was "upset" and "scared" because "growing up as a child I used to see my father get beat up by police," and in April 1999, his "godbrother" "stopped breathing while [he was] in the custody of police."
At 12:10 p.m., defendant signed the Miranda waiver form and at 12:15 p.m., began his written statement in a question and answer format. In response to the initial questions in the written statement, defendant said he was twenty-three and had finished his sophomore year in college. In the statement, defendant acknowledged that the Miranda warnings were read to him verbally, that he read and signed the waiver form and that he was giving the statement of his own free will without any threats or promises. He stated that the SUV was a "cab" and the driver, whom he had never met before, was an employee of Class A Limousine Service in New York. Before going to the Smith home in Newark to look for his friend, defendant had been cruising around New York and Jersey City. When the police came to the Smith home and followed the SUV, the driver tried to pull over. Defendant pulled out his gun and told the driver to keep going. Defendant stated that the driver tried to *214 take the gun and "one (1) shot went off. Then I tried to gain control of the jeep because the driver was slumped over ... and a couple of more shots came from my gun." The question and answer session resulting in defendant's written statement ended at 3:20 p.m., twelve hours after his arrest.
Defendant testified that he knew Detective Melillo from a prior incident when he was questioned by police about another murder and felt he had been threatened at that time. So, when he was presented with the waiver form and written statement, he signed them because he was afraid.
While defendant was being interrogated on the murder charge, Newark Police Detective Michael DeMaio was investigating a rash of bank robberies when he saw a photograph of defendant on another detective's desk. DeMaio recognized the photo on the desk as similar to photos taken by a bank surveillance camera during one of the robberies he was investigating. At about 4:15 on the afternoon of January 24, DeMaio went to the room where defendant was still being detained on the murder charge, advised defendant of his Miranda rights and showed him the bank surveillance photograph. DeMaio testified that he asked defendant if he wanted to talk about it, defendant agreed and gave five written statements, in question and answer format, between 5:00 p.m. on January 24 and 12:40 a.m. on January 25. Defendant signed a Miranda waiver form before giving each statement, and signed the surveillance photos presented by DeMaio, identifying them as photos of him.
At the suppression hearing on the robbery charges, DeMaio testified that they took breaks for defendant to eat, drink, use the rest room and smoke cigarettes. During DeMaio's questioning, defendant was wearing the hospital gown, but DeMaio did not know why. Defendant was still handcuffed to a chair, but the cuffs were removed to allow him to eat and go to the rest room. DeMaio was aware defendant had been held for over twelve hours on the murder charge when he approached defendant, but was unaware that defendant had just been interrogated for hours by another detective respecting the murder investigation or that defendant had given a written statement in that case.
At the robbery suppression hearing, defendant testified to essentially the same scenario leading up to his questioning by DeMaio as he did during the suppression hearing on the murder charge. Defendant acknowledged making statements to DeMaio admitting each of the robberies. When the statements were typed and brought to him for signature, however, he told the detective and a federal agent who was present that he "was thinking twice about signing `em [sic]." He claimed that DeMaio then promised him that if he signed the statements, he would receive probation if and when he returned the money taken from the banks. Defendant denied identifying himself in the bank surveillance photos but said DeMaio told him the photos were of him and there was "[n]o reason for me lying. Make it easy on myself," so he signed the photos.
Defendant testified that he did not make the statements voluntarily, rather he "conjured up part of the story that they had." He reiterated his fear because his "godbrother... stopped breathing while he was in the custody of police." He acknowledged he never asked to stop the interrogation or asked for a lawyer or counsel, but that he asked to "have somebody come as a form of representation" and "was hoping that my grandfather could come in there with me" because he did not "trust" the police, "didn't feel comfortable, didn't really know what to expect." Defendant *215 testified that he was given a turkey sandwich toward the end of the robbery interrogation but that he threw it away because he did not trust the police.
Defendant did not remember if he read the Miranda waiver forms and typed statements or they were read to him before he signed them. Nevertheless, he acknowledged that he understood his rights and that he was familiar with the arrest and interrogation process from his two prior convictions.
Two separate indictments resulted from this marathon interrogation, one charging defendant with murder and related offenses and the other with conspiracy and five counts of robbery. We reverse the murder conviction and remand for a new trial on the ground that the totality of the circumstances from the time of defendant's arrest to the conclusion of his confession were inherently coercive rendering the confession inadmissible. We reverse the robbery convictions, as well, because the robbery interrogation was tainted by the preceding murder interrogation and exacerbated by the continuation of the inherently coercive circumstances. We remand the robbery convictions, as well, for defendant to withdraw his plea and proceed to trial.

I

THE MURDER CONVICTION

A-4099-02T4
We will first address the murder interrogation. Following the suppression hearing on the murder charge, the trial court found that "[t]he fact that Mr. Knight did not have any clothing is not the doing of the police.... [It] was something of his own doing. [It] would [not] be part of a technique that the police used in interrogating Mr. Knight." The judge acknowledged that the "[c]ontinuing ... time frame in this case is certainly ... by anyone's account long. Whether it's psychologically coercive, that is different." Defendant's acknowledgement that there were breaks in the questioning, however, persuaded the judge that "the questioning wasn't so overbearing that it would break the psychological will of the defendant in this particular case." He found that defendant's statement was given voluntarily after a knowing waiver of his Miranda rights.
Following denial of his suppression motion, defendant was tried to a jury on Indictment XX-X-XXXX and convicted of first degree murder (Count 1); third degree unlawful possession of a handgun (Count 4); second degree possession of a weapon for unlawful purpose (Count 5); and second degree eluding (Count 6). Count 5 was merged into Count 1, and defendant was sentenced to an aggregate term of life subject to thirty years parole ineligibility pursuant to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. Counts 2 and 3, each charging second degree aggravated assault, were dismissed after the State's case. Defendant appealed.
The brief submitted on defendant's behalf by counsel argues:
POINT ONE
THE TRIAL COURT ERRED IN DENYING THE DEFENDANT'S MOTION TO SUPPRESS HIS WRITTEN STATEMENT BECAUSE INVESTIGATOR GREGORY'S INTERROGATION OCCURRED UNDER CIRCUMSTANCES THAT SATISFIED THE "UNFAIR MEANS" TEST ARTICULATED BY THE COURT IN STATE V. ROACH

POINT TWO
THE DEFENDANT'S CONVICTIONS SHOULD BE REVERSED BECAUSE *216 THE TRIAL COURT'S LACK OF JUDICIAL SELF-RESTRAINT DURING THE DEFENSE COUNSEL'S CROSS-EXAMINATION OF POLICE OFFICER SCOTT, INVESTIGATOR GREGORY, AND DETECTIVE MELILLO MANIFESTED A BIAS AGAINST THE DEFENDANT THAT RENDERED THE TRIAL FUNDAMENTALLY UNFAIR (NOT RAISED BELOW)
POINT THREE
THE PROSECUTOR'S VICTIM IMPACT COMMENTS IN SUMMATION DEPRIVED THE DEFENDANT OF HIS RIGHT TO A FAIR TRIAL (NOT RAISED BELOW)
POINT FOUR
IMPOSITION OF A NERA PERIOD OF PAROLE INELIGIBILITY ON THE DEFENDANT'S CONVICTION FOR MURDER ON COUNT ONE WAS ILLEGAL BECAUSE THE NERA LAW THAT WAS IN EFFECT WHEN THE DEFENDANT COMMITTED THE OFFENSE DID NOT APPLY TO MURDER
Defendant submitted a pro se supplemental brief which contains no point headings, but to the extent we understand it, he argues that (1) he was deprived of his Sixth Amendment right to counsel; (2) the trial court erred in denying his motion to suppress; (3) the trial court committed "constitutional error when he was denied participation in his own trial. Pursuant to rule 43 [sic] of the Federal Rules of Criminal Procedure, the presence of the defendant is required unless rules provides [sic] to contrary;"[4] (4) the trial court erred in admitting photos of decedent into evidence; and (5) the interrogation by Detective DeMaio violated the Fifth and Fourteenth Amendments. In his pro se supplemental brief, defendant also "moves for an order requiring the prosecutor to turn over state's evidence for DNA testing pursuant to R. 2:9-1."
Our discussion focuses on the denial of defendant's motions to suppress and the circumstances of the interrogation that led to the confessions. It is well established that the Fifth Amendment of the United States Constitution protects against self-incrimination during custodial interrogations. Miranda, supra, 384 U.S. at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 706. Custodial interrogations are defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." State v. Brown, 352 N.J.Super. 338, 351, 800 A.2d 189 (App.Div.), certif. denied, 174 N.J. 544, 810 A.2d 64 (2002) (quoting Miranda, supra, 384 U.S. at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 706). In Miranda, the United States Supreme Court required that persons suspected of a crime be apprised of their Fifth Amendment rights before being subjected to custodial interrogation. 384 U.S. at 467, 86 S.Ct. at 1624, 16 L.Ed.2d at 719. Consequently, a confession rendered in custody must be preceded by a knowing, intelligent, and voluntary waiver of Miranda rights in order to be admissible. State v. DiFrisco, 174 N.J. 195, 235, 804 A.2d 507 (2002), cert. denied, 537 U.S. 1220, 123 S.Ct. 1323, 154 L.Ed.2d 1076 (2003).
The voluntary waiver is based "on notions of due process." Dickerson v. U.S., 530 U.S. 428, 433, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000). The voluntariness test evolved "into an inquiry that examines 'whether a defendant's will was overborne' by the circumstances surrounding the confession. The due process test takes into *217 consideration `the totality of all the surrounding circumstancesboth the characteristics of the accused and the details of the interrogation.'" Id. at 434, 120 S.Ct. 2326 (citing Schneckloth v. Bustamonte, 412 U.S. 218, 226, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)).
The totality of the circumstances test is highly fact sensitive and has been applied by New Jersey courts in numerous cases with differing results, depending upon the facts presented. See, e.g., State v. Roach, 146 N.J. 208, 227, 680 A.2d 634, cert. denied, 519 U.S. 1021, 117 S.Ct. 540, 136 L.Ed.2d 424 (1996) (holding that defendant's confession was voluntary, notwithstanding his belief that his statement was sought as a witness rather than a defendant); State v. Reed, 133 N.J. 237, 256, 268, 627 A.2d 630 (1993) (holding that "failure of the police to inform defendant that an attorney was present and asking to speak with him violated defendant's privilege against self incrimination" and rendered the confession inadmissible); State v. Galloway, 133 N.J. 631, 655, 628 A.2d 735 (1993) (holding that the police lying to a suspect during interrogation does not, by itself, render a confession involuntary); State v. Pickles, 46 N.J. 542, 577-78, 218 A.2d 609 (1966) (holding that incommunicado interrogation of a woman, who was grieving after her son's funeral, was so fundamentally unfair as to render her statement involuntary).
The voluntariness of inculpatory admissions is not tested only by the presence or absence of violence or threats to the accused or by whether there were direct or implied promises to him of reward or benefit. Admissibility depends also on the nature of the interrogation, and whether psychological coercion or duress or imposition was practiced by law enforcement authorities. In sum the competency of a confession not only depends upon compliance with the ordinary rules of evidence, but also upon the deeper requirement of fundamental fairness in the due process sense of the Fourteenth Amendment.
[Pickles, supra, 46 N.J. at 576, 218 A.2d 609 (citations omitted).]
"Certain interrogation techniques are so inappropriate that application of a totality of the circumstances test is inadequate to assure that the resultant confession was voluntary, and the use of the technique renders the confession per se inadmissible." State v. Patton, 362 N.J.Super. 16, 45, 826 A.2d 783 (App.Div.), certif. denied, 178 N.J. 35, 834 A.2d 408 (2003) (holding that "fabrication of evidence by police to elicit a confession ... violates due process, and any resulting confession is per se inadmissible"). Where interrogation techniques are inherently coercive, we will not balance "the cost of suppressing evidence of guilt against the value of the ancillary rights against self-incrimination. Such a balancing approach will always make the prophylactic rights appear minimal, marginal or incremental." Ibid. (citing Moran v. Burbine, 475 U.S. 412, 452, 106 S.Ct. 1135, 1156-57, 89 L.Ed.2d 410, 440-41 (1986); State v. Hartley, 103 N.J. 252, 261-63, 511 A.2d 80 (1986)).
Other courts have adopted the per se rule when the parameters of interrogation have exceeded the bounds of fundamental fairness rendering the interrogation inherently coercive and defendant's statements inadmissible per se. See, e.g., Clewis v. Texas, 386 U.S. 707, 712, 87 S.Ct. 1338, 18 L.Ed.2d 423 (1967) (holding defendant's statements inadmissible when his "faculties were impaired by inadequate sleep and food, sickness, and long subjection to police custody with little or no contact with anyone other than police"); Commonwealth v. Jackson, 497 Pa. 591, 598-99, 442 *218 A.2d 1098 (1982) (holding that interrogation by a number of officers for eight hours while defendant was held incommunicado was inherently coercive and per se inadmissible); People v. Anderson, 42 N.Y.2d 35, 41, 396 N.Y.S.2d 625, 364 N.E.2d 1318 (1977) (holding that incommunicado detention for nineteen hours during which defendant was deprived of sleep and food while interrogators worked in relays was coercive and "the use of his confession offends due process"); Commonwealth v. Lopez, 472 Pa. 465, 472-73, 372 A.2d 785 (1977) (holding that defendant's statements "resulted from an essentially coercive atmosphere and should have been suppressed as involuntary" when they were made fifteen and twenty-two hours after his arrest while he "was held incommunicado, without adequate opportunity for rest or food").
"The inherently coercive nature of incommunicado interrogations argues in favor of a clear principle to safeguard the presumption against the waiver of constitutional rights." Reed, supra, 133 N.J. at 265, 627 A.2d 630. In State v. Free, 351 N.J.Super. 203, 798 A.2d 83 (App.Div. 2002), defendant "was taken into custody 1/8/98 at 5:18 p.m. and concluded his last of 3 taped statements on 1/9/98 at 10:29 a.m., more than 17 hours later." Id. at 206, 798 A.2d 83. The defendant was questioned by multiple interrogators in "a small, barely furnished room equipped with a 2-way mirror, without contact with family or friends." Id. at 206-07, 798 A.2d 83. He had not eaten since the morning before his arrest and was seriously sleep deprived by the time he gave the first of three statements. Id. at 207, 798 A.2d 83. The interrogation was not recorded until defendant admitted the charges. Ibid. Moreover, each time defendant denied the allegations, the police interrupted him and said they wanted the truth. Id. at 207-08, 798 A.2d 83. Finally, defendant was given a polygraph test apparently "designed more to extract a confession than to discern if [defendant] was truthful or deceptive." Id. at 208, 798 A.2d 83. After being told the test results, defendant "figured I was already guilty because ... the lie detector said I failed." Id. at 208-09, 798 A.2d 83. We concluded that the circumstances of Free's interrogation were "highly coercive" resulting in "ambiguous and potentially unreliable" statements. Id. at 210, 798 A.2d 83.
"Confessions are not voluntary if derived from `very substantial' psychological pressures that overbear the suspect's will." State v. Cook, 179 N.J. 533, 563, 847 A.2d 530 (2004). To determine whether the totality of the circumstances are so egregious that an interrogation is inherently coercive rendering the confession inadmissible per se, we must consider a number of factors, including but not limited to: (1) the length of interrogation time; (2) the physical conditions; (3) the techniques used; (4) the persistence in questioning in the face of denials; or (5) presentation of false evidence or promises. Free, supra, 351 N.J.Super. at 207-08, 798 A.2d 83.
In considering defendant's statement respecting the murder charge, we defer to the factual findings of the trial judge, State v. Locurto, 157 N.J. 463, 470-71, 724 A.2d 234 (1999), but disagree with his conclusion. A summary of the facts respecting the murder interrogation is as follows: Defendant was initially taken into custody shortly after 3:00 a.m. on January 24. He was wearing a jockstrap and Tshirt and was barefoot when he was placed on the ground, handcuffed and then escorted to a patrol car where he remained with no additional clothing or covering for at least two hours until Gregory and Melillo arrived at the scene shortly *219 after 5:00 a.m. Defendant was then transported to police headquarters, where his T-shirt was taken for DNA testing, but he was given a hospital gown and a pair of socks. He was handcuffed to a chair and questioned intermittently by several different officers, none of whom took notes or recorded the interview[5] until 12:10 p.m., when defendant first signed a waiver form. Defendant began his question and answer formatted statement at 12:15 p.m. and concluded it at 3:20 p.m. Defendant was provided with a can of soda and a bag of chips during the twelve hours he was in custody before concluding his statement on the murder charge. Although the interrogation was not continuous, defendant was held incommunicado during the entire time and was not given any opportunity to rest. Since he was taken into custody shortly after 3:00 a.m. and the evidence indicated he had spent the earlier hours that night in New York and Jersey City, it is obvious that by the time he concluded his statement at 3:20 p.m. on January 24, he was seriously sleep deprived. In our view, the totality of these circumstances rendered the interrogation inherently coercive.
The length of the interrogation alone exceeded the bounds of due process. Although it is unclear just when the interrogation began, Gregory acknowledged that he had questioned defendant for "hours" before and after the written waiver was signed. "The most common circumstance supporting a claim of duress is the length of an interrogation." Fred E. Inbau, et al., Criminal Interrogation & Confessions, 422 (4th ed.2001). While there is no hard and fast rule delineating when the length of an interrogation becomes coercive, "[w]hen fatigue, withdrawal, hunger, thirst, or a craving for other biological needs serve as the primary incentive for a confession, duress may be claimed." Ibid. An interrogation lasting three to four hours is not generally considered too long but if the totality of the circumstances is inherently coercive, "even a 30-minute interrogation may warrant such a bona fide claim." Id. at 423.
With respect to the physical conditions, defendant acknowledged that he removed his clothes and threw them out the window of the SUV because he was going to tell the police he was being robbed. Nevertheless, holding him in a patrol car on a cold January night for at least two hours while wearing only a jockstrap and T-shirt, was coercive. Moreover, Gregory acknowledged that defendant initially denied the accusations but he persisted in questioning defendant because, in his experience, suspects do not tell the truth initially.
Supplying defendant with a hospital gown at police headquarters was problematical by itself and when considered in conjunction with the length of time he was held incommunicado, the minimal amount of food he was given, the deprivation of sleep, and the persistent questioning in the face of denials, the totality of the circumstances rendered this interrogation inherently coercive and "argues in favor of a clear principle to safeguard the presumption against the waiver of constitutional rights." Reed, supra, 133 N.J. at 265, 627 A.2d 630. Defendant's motion to suppress was erroneously denied and his confession was improperly admitted into evidence at trial. We are, therefore, constrained to reverse the convictions on Indictment XX-X-XXXX and remand for a new trial consistent with this opinion.

*220 II

THE ROBBERY CONVICTIONS

A-2933-02T4
The five statements respecting each of the five robbery counts charged in Indictment XX-XX-XXXX were made after the murder statements, beginning more than thirteen hours after defendant was taken into custody and continuing for more than twenty hours after defendant's arrest. During this entire time, defendant was inadequately clothed, was held incommunicado, was given minimal food, and was even more seriously sleep deprived than during the murder interrogation. Defendant signed the first of five waiver forms at 4:37 p.m. and the statements were completed at 6:15 p.m., 6:45 p.m., 10:20 p.m., 11:20 p.m., and 12:40 a.m. on January 25, respectively.
After a lengthy suppression hearing in the robbery case, which included testimony on the murder interrogation that preceded the robbery interrogation, the trial judge found defendant's testimony lacking in credibility and discredited his claim that his Godbrother had died in police custody in 1999 because defendant failed to substantiate the claim. The judge found that the State met its burden in proving beyond a reasonable doubt the voluntariness of the incriminating statements. He found the evidence met the criteria set forth in State v. Galloway, 133 N.J. 631, 654, 628 A.2d 735 (1993), in that defendant was twentythree years old, had at least one year of college and understood his rights from prior involvement with the law. He concluded that the length of detention, together with the prolonged and repeated nature of the questioning, was not mentally exhausting or coercive.
Following denial of defendant's motion to suppress, he pled guilty to second degree conspiracy to commit robbery (Count
1); three counts of second degree robbery (Counts 2, 4 and 6); and two counts of first degree robbery (Counts 3 and 5). At sentencing, Count 1 was merged into the remaining counts and defendant was sentenced to an aggregate term of twenty years subject to eighty-five percent parole ineligibility under the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, and fifty percent parole ineligibility under the Graves Act, N.J.S.A. 2C:43-6, concurrent to the sentence imposed in Indictment XX-XX-XXXX.
In the robbery appeal, defendant argues:
POINT ONE
DETECTIVE DEMAIO'S INTERROGATION OF THE DEFENDANT CONSTITUTED AN "UNFAIR MEANS" WHICH SHOULD HAVE PRECLUDED ADMISSION OF THE DEFENDANT'S STATEMENTS BECAUSE IT TOOK PLACE IMMEDIATELY AFTER THE DEFENDANT'S INTERROGATION ON THE MURDER CHARGES AND WAS INDUCED BY FEAR OF BODILY HARM AND PROMISE OF PROBATION
POINT TWO
IMPOSITION OF THE TWENTY (20) YEAR EXTENDED TERM SENTENCES ON THE DEFENDANT'S CONVICTIONS FOR SECOND DEGREE ROBBERY ON COUNTS FOUR AND SIX WERE ILLEGAL BECAUSE THE COURT HAD ALREADY IMPOSED AN EXTENDED TERM SENTENCE ON THE DEFENDANT'S CONVICTION FOR SECOND DEGREE ROBBERY ON COUNT TWO
We will not disturb the trial judge's finding that defendant's testimony lacked credibility. Locurto, supra, 157 *221 N.J. at 470-71, 724 A.2d 234. Nevertheless, we disagree with the trial judge's conclusion that defendant's age, education and familiarity with the criminal process was sufficient to render his waiver of rights and statements voluntary under the totality of circumstances. "[A] waiver of the right against self incrimination which, by all subjective indicia, appears knowing, intelligent, and voluntary, may still be deemed invalid when elicited in an atmosphere of coercion." Reed, supra, 133 N.J. at 256, 627 A.2d 630. "Confessions obtained through undue compulsion or coercion are considered involuntary and, therefore, unreliable. We exclude from evidence such confessions, not only because we view an involuntary confession as intrinsically unreliable, `but also because its admission would offend the community's sense of decency and fairness.'" Cook, supra, 179 N.J. at 560, 847 A.2d 530 (quoting State v. Kelly, 61 N.J. 283, 292, 294 A.2d 41 (1972)).
Even accepting DeMaio's testimony that he gave defendant breaks to eat, use the restroom and smoke, the length of interrogation on the robbery charges after the interrogation on the murder charge, the continuing deprivation of sleep, and inadequate food and clothing, created such an inherently coercive atmosphere as to render the five statements involuntary. Free, supra, 351 N.J.Super. at 206-10, 798 A.2d 83; Patton, supra, 362 N.J.Super. at 44-45, 826 A.2d 783.
Defendant's motion to suppress was erroneously denied. We are, therefore, constrained to reverse the convictions on Indictment XX-XX-XXXX, as well, and remand for defendant to withdraw his plea and proceed to trial.

III
Because we are reversing the murder and robbery convictions, we need not address defendant's other arguments except to add the following.
The State concedes that the NERA sentence was improperly imposed on the murder charge under State v. Manzie, 335 N.J.Super. 267, 762 A.2d 276 (App.Div. 2000), aff'd o.b., 168 N.J. 113, 773 A.2d 659 (2001). With respect to the robbery appeal, the State concedes that the sentence was not consistent with the plea agreement and should be corrected.
These and defendant's other arguments are moot by virtue of our decision reversing the convictions. We have no reason to anticipate the sentencing errors recurring, nor do we expect the circumstances giving rise to defendant's other arguments occurring during the new trials.

CONCLUSION
The convictions on Indictment XX-XX-XXXX and Indictment XX-XX-XXXX are reversed and remanded for new trials.
NOTES
[1] Defendant was charged in Indictment XX-X-XXXX with first degree murder, N.J.S.A. 2C:11-3A(1) and (2); two counts of second degree aggravated assault, N.J.S.A. 2C:12-1B(1); third degree unlawful possession of a handgun, N.J.S.A. 2C:39-5B; second degree possession of a weapon for unlawful purpose, N.J.S.A. 2C:39-4A; and second degree eluding, N.J.S.A. 2C:29-2B.
[2] Defendant was charged in Indictment XX-X-XXXX with second degree conspiracy, N.J.S.A. 2C:5-2 and 15-1; three counts of second degree robbery, N.J.S.A. 2C:15-1; two counts of first degree robbery, N.J.S.A. 2C:15-1; third degree unlawful possession of a handgun, N.J.S.A. 2C:39-5b; and second degree possession of a weapon for unlawful purpose, N.J.S.A. 2C:39-4a.
[3] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[4] Claims under the Federal Rules of Criminal Procedure are not cognizable in State court.
[5] There is no duty to electronically record a custodial interrogation. Cook, supra, 179 N.J. at 559, 847 A.2d 530. The means used by police to preserve a defendant's statements goes to the weight of the evidence rather than the admissibility. Ibid.